The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the Deputy Commissioner. The Full Commission enters the following Opinion and Award.
 ***********
Plaintiff's motion for the taking of additional evidence is HEREBY DENIED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 1 September 1999 as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured.
3. The employee-employer relationship existed between the parties at all relevant times.
4. At the time of the alleged occupational disease, plaintiff's average weekly wage was $156.00.
5. The date of the alleged occupational disease exposure is February 1, 1995.
6. The following documentary evidence was received into the record:
a. Stipulated Exhibit 1, Defendant's Response to Interrogatories;
 b. Defendant's Exhibit 1, Drawing of Mechanical Print of Eastern Portion of the Defendant's Plant.
7. The issue for determination is: Whether plaintiff contracted a compensable occupational disease on February 1, 1995, and if so, to what benefits may he be entitled under the Act?
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a forty-nine year old male high school graduate. He began working for the defendant on August 5, 1969. Plaintiff worked on first shift as a checker-loader.
2. In 1995, the defendant remodeled its warehouse, adding a new loading dock and painting the inside and outside of the new dock area. The dock area had 25-foot ceilings, six 40,000 CFM circulation fans that exchanged the air six times per hour, open bay doors, and eleven louvered openings adjacent to both the new docks and the existing building. A new break room was constructed in the new office area of the plant. However, other than going to the break room, plaintiff had no reason to be in the new construction area prior to March 27, 1995.
3. On February 7, 1995, the defendant's contractor began painting in the dock area. Painting was done primarily on second shift and on weekends. The contractor was responsible for moving its own materials and for cleaning up the area. Defendant's employees were not allowed to access the new dock area until March 27, 1995. In fact, it was not until March 27, 1995 that a cement ramp was poured to allow forklift access between the old part of the plant and the new dock area. The painting was completed in May 9, 1995.
4. After March 27, 1995, plaintiff was permitted to operate a forklift within the interior of the new dock area. Plaintiff moved materials between the old section of the plant and the new dock area. He would stack boxes in the new section of the plant.
5. On or about June 13, 1995, plaintiff began to complain of nausea, numbness in his left hand and left foot, conjunctivitis in both eyes, abnormal heart rhythms, and hearing loss in his left ear.
6. The defendant-employer received no complaints like those voiced by plaintiff from the contract painters working in the plant addition. Although two of the other forklift operators complained at the hearing of headaches while working in the area where the painting was taking place, neither of them reported any problems to their supervisors at the time. In addition, none of the workers in the plant reported any lost time from work as a result of working in the area while the painting was taking place.
7. Plaintiff was out of work from June 13, 1995 through June 19, 1995.
8. Prior to February 1, 1995, plaintiff sought medical treatment for dizziness, chest pains, and fainting.
9. On June 13, 1995, as plaintiff was going to lunch, he felt as if he would pass out. After reporting this episode, plaintiff's supervisor drove him to the Frye Hospital emergency room, following which he was admitted to the hospital. Cardiologist Dr. Phillip Paspa treated plaintiff for an irregular heartbeat and lightheadedness.
10. On June 15, 1995, plaintiff was transferred to N.C. Baptist Hospital for an evaluation of supraventricular tachycardia, where Dr. David Fitzgerald, a cardiologist and specialist in heart rhythm problems, treated him. Based upon the history which plaintiff related, Dr. Fitzgerald noted plaintiff had a family history of heart disease and stroke.
11. After treadmill and lab studies were normal, plaintiff was given Propafenone and Cardizem for his dysrhythmia. He began to show improvement after one and one-half days on the medication. Plaintiff was released from the hospital on June 18, 1995.
12. On July 13, 1995, plaintiff sought treatment from Dr. Henry Igdal. Dr. Idgal noted that although plaintiff had been prescribed Propafenone by the cardiologist at Baptist Hospital, plaintiff was taking Rhythmol for the sporadic ectopic atrial tachycardia with rapid ventricular response. Following an examination, Dr. Igdal referred plaintiff to neurologist Dr. Larry Boyles for a follow-up on the left-sided parasthesias.
13. On August 8, 1995, plaintiff returned to Dr. Fitzgerald for a follow-up on his ectopic atrial tachycardia. Plaintiff reported to Dr. Fitzgerald that he was convinced that his heart problem was due to toxic exposure to paint fumes at work.
14. On August 25, 1995, neurologist Dr. David Lefkowitz evaluated plaintiff for peripheral neuropathy. Plaintiff brought copies of paint can labels with him to the evaluation. Despite plaintiff's complaints that the symptoms were due to paint exposure at work, Dr. Lefkowitz found that plaintiff's symptoms did not begin until almost five months after the alleged toxic exposure at work, the plaintiff's headaches were bitemporal in nature, more like a muscle contraction/tension headache, and the neuropathy only affected one side (the left) of plaintiff's body. On September 20, 1995, plaintiff again reported a history of these symptoms beginning after an exposure to paint fumes at work.
15. Although plaintiff was diagnosed with an irregular heartbeat, there is no evidence to support a finding that this condition was related to any alleged chemical exposure at work.
16. Neither plaintiff's mild peripheral neuropathy nor his headaches were caused by any alleged chemical exposure at work.
17. Plaintiff's heart symptoms resolved after two and a half years of taking heart medication. Dr. Fitzgerald released plaintiff from his treatment on November 5, 1997.
18. Plaintiff continues to work for the defendant-employer without restrictions, and he earns the same or greater wages than the pre-injury wage.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
The plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. GEN. STAT. § 97-53(13). This requires the plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101 (1981). In the instant case, plaintiff failed to offer competent medical evidence to establish that any alleged chemical exposure caused or significantly contributed to his irregular heartbeat, headaches or left-side parasthesias.
Furthermore, plaintiff had failed to offer any competent evidence that his irregular heartbeat, headaches or left-side parasthesias were characteristic of or peculiar to his employment. Therefore, his claim must fail.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff's claim is, and under the law must be, DENIED.
2. Each side shall pay its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER